**In the Matter of Lammot duPont Copeland, Jr., Debtor (two cases).**

**Appeal of Lammot duPont COPELAND, Jr. ("Debtor"), Debtor-in-Possession in the above-described Proceedings for an Arrangement (the Proceedings), and the Statutory Creditors' Committee in the Proceedings (the "Creditors' Committee").**

**Appeal of PENSION BENEFIT FUND, INC.**

**Nos. 75–1366 and 75–1500.**

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 1975.

Decided March 3, 1976.

E. Norman Veasey, Martin I. Lubaroff, Richard G. Elliott, Jr., Michael A. Meehan, Richards, Layton & Finger, Wilmington, Del., for The Debtor Lammot duPont Copeland, Jr.

Howard L. Williams, Eduard F. von Wettberg, III, Morris, James, Hitchens & Williams, Wilmington, Del., for The Statutory Creditors' Committee.

Joseph Donald Craven, F. Alton Tybout, Wilmington, Del., for Pension Benefit Fund, Inc.

Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

This is a consolidated appeal from two separate orders of the district court in a Chapter XI bankruptcy proceeding instituted by Lammot duPont Copeland, Jr. (hereinafter "Copeland" or "debtor"). The appeals are united by a common factual basis. In July of 1967, Copeland personally guaranteed payment on a $2,700,000 loan by Pension Benefit Fund, Inc. ("Pension Benefit") to two corporations and entered into an agreement which required him to pledge as collateral security 18,187 shares of Christiana Securities Co. stock. An "escrow agreement" was simultaneously executed between Copeland, Pension Benefit and Wilmington Trust Company ("Wilmington Trust") which designated Wilmington Trust as escrow holder of the pledged stock.

Nearly three years later, in April, 1970, there was a default on the loan. Following written demand upon the principal corporations for payment, Pension Benefit notified Copeland and Wilmington Trust by letter of September 11, 1970 of the uncured default and of its intention to demand the surrender of the escrowed stock in accordance with the pledge agreement. Copeland did not respond to this letter, but on October 20, 1970, filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.*, and an application to stay enforcement of Pension Benefit's lien on the Christiana stock. Thereafter, Copeland withdrew his objection to the delivery of the stock to Pension Benefit, and the stock was turned over by Wilmington Trust on December 1, 1970. The market value of the stock on this date was less than the unpaid balance due on the loan. Subsequently, Pension Benefit filed an amended proof of claim to recover the difference.

It was not until July 27, 1972, nearly a year and a half later, that the debtor first objected to Pension Benefit's proof of claim

and filed a counterclaim seeking, *inter alia*, an accounting for any surplus which might exist in the appreciated value of the stock over the amount due on the loan. Pension Benefit moved to dismiss the counterclaim for failure to state a claim upon which relief could be granted, and the debtor moved for summary judgment. By order of April 3, 1973, Pension Benefit's motion to dismiss was denied, and the debtor's motion for summary judgment was granted insofar as it requested an evaluation proceeding to ascertain the value of the stock. The order additionally required Pension Benefit to make application to the court before selling or encumbering the stock. Following the district court's affirmance of the referee's order, Pension Benefit appealed.

In addition to counterclaiming for recovery of the surplus value of the stock after payment of the debt, on October 19, 1973, debtor filed an independent application for an order requiring Pension Benefit to surrender the stock itself and dividends received with respect thereto. Debtor's application was denied by the district court, sitting as a bankruptcy court, by order dated February 3, 1975. Debtor and the Statutory Creditors' Committee appealed.[1]

## I. DEBTOR'S APPEAL

We shall consider first the issues raised in debtor's appeal since, if he is successful in recovering the stock, Pension Benefit's appeal will be rendered moot.

Copeland asserts a superior right to possession of the stock by virtue of his status as debtor-in-possession which enables him to exercise all the powers of a trustee in bankruptcy, Bankruptcy Act § 342, and specifically, to avail himself of all rights and remedies of any creditor—real or hypothetical—who had or could have obtained a lien on the debtor's property on the date of bankruptcy. Bankruptcy Act § 70c. The rights of a lien creditor must be determined

---

1. For convenience, their joint appeal will be referred to as "debtor's appeal." In view of our disposition of the appeal, we find it unnec-essary to determine the validity of Pension Benefit's claim that the Creditors' Committee is not a proper party to these proceedings.

by reference to state law. Pertinent here is § 9–301(1)(b) of the Uniform Commercial Code as enacted in Delaware, 6 Del.C. § 9–301(1)(b),[2] which provides:

"(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of

\* \* \* \* \* \*

"(b) a person who becomes a lien creditor without knowledge of the security interest and before it is perfected."

Since under § 70c of the Bankruptcy Act the trustee has all rights of an ideal lien creditor under § 9–301(1)(b) of the Code, his rights in the stock are superior to Article 9 claimants whose interests were unperfected as of the date of bankruptcy.

Copeland contends that Pension Benefit's security interest in the Christiana stock was unperfected on the date of bankruptcy. He asserts that the district court therefore erred in denying his application for an order requiring Pension Benefit to surrender the stock and dividends received with respect thereto.

### A. Attachment

Copeland first argues that Pension Benefit's security interest was unperfected because it had not attached as of October 20, 1970, the date on which debtor filed his Chapter XI petition. The district court determined to the contrary.

■ Section 9–303 provides that a "security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken." Attachment occurs under § 9–204 when there is an agreement that the security interest attach, value is given, and the debt-

or has rights in the collateral. A security interest attaches immediately upon the happening of these events "unless explicit agreement postpones the time of attaching." § 9–204(1). Although the aforementioned prerequisites to attachment had been fulfilled on the date the pledge agreement was executed in 1967,[3] Copeland contends that the parties explicitly agreed to postpone the time of attachment. In support of this contention, he relies upon paragraph 8 of the pledge agreement which states:

"8. In the event there is a default by the Pledgor in the performance of any of the terms of this Agreement, or if there is a default in the payment of the loan as provided in the note and if such default continues for a period of fifteen (15) days, the Pledgee shall have the right, upon fifteen (15) days notice, sent by registered mail to the Pledgor, to call upon The Wilmington Trust Company to forthwith deliver all of the stock and stock powers which it is holding as security hereunder to Pledgee, or such other party as Pledgee may designate, and thereupon, without any liability for any diminution in price which may have occurred, and without further consent by the Pledgor, the said Pledgee may sell all or part of the said stock in such manner and for such price or prices as the said Pledgee may be able to obtain. At any bona fide public sale, the Pledgee shall be free to purchase all or any part of the pledged stock. Out of the proceeds of any sale, the Pledgee shall retain an amount equal to the entire unpaid principal and interest then due on the loan plus the amount of the actual expenses of the sale and shall pay the balance to the Pledgor. In the event that the proceeds of any sale are insufficient to cover the entire unpaid principal and interest of the

---

2. Delaware has adopted the 1962 Official Text of the Uniform Commercial Code. Hereinafter, all section references will be to this version of the Code as enacted in Delaware.

3. The pledge and escrow agreements together constituted the requisite agreement. Value was given by Pension Benefit's binding com-

mitment to extend credit. § 1–201(44). The debtor had rights in the collateral in that he remained owner of record and was empowered to vote the shares and receive the dividend income even after the stock was transferred to Wilmington Trust.

loan plus the expenses of the sale, the Pledgor shall be liable for any deficiency."

Copeland argues that by the terms of this paragraph, Pension Benefit's security interest did not attach until each of the following events had occurred: (1) the debtor had defaulted; (2) default had continued for fifteen days; (3) fifteen days written notice by registered mail had been sent to the debtor by Pension Benefit; (4) proper demand had been made upon Wilmington Trust to deliver the stock and stock powers; and (5) the stock and stock powers had been delivered to Pension Benefit. Since the stock was not turned over to Pension Benefit until December 1, 1970, he maintains that the security interest had not attached, and consequently, was not perfected, on the pivotal date of bankruptcy, October 20, 1970.

We believe that the relevant language of paragraph 8 which debtor urges postpones the date of attachment merely establishes an orderly procedure for enforcement of the security interest upon default. It is understandable that debtor would seek to protect his stock to the fullest extent possible from hasty and premature foreclosure attempts by Pension Benefit. Indeed, § 9–501 of the Code, with exceptions not here relevant, specifically recognizes the right of parties to a security agreement to agree among themselves as to the duties and responsibilities of a secured party when default occurs. To read paragraph 8 as anything other than an attempt to safeguard debtor's interest in the valuable pledged stock against unwarranted claims of default and improper attempts to enforce the security interest would distort the nature of the transaction envisioned by the parties and would render Pension Benefit's security for repayment of the loan largely meaningless. We say this because Pension Benefit's interest in the stock would be subordinate to any intervening creditors who had obtained and perfected a security interest in the stock after Pension Benefit but before bankruptcy, a result clearly not intended by either party. We therefore conclude that the pledge agreement was not intended to delay the date of attachment of Pension Benefit's security interest, but rather was designed to protect debtor's interest in the stock from improper attempts by Pension Benefit to obtain its possession in the event there was a claim of default.

Our conclusion is not altered by the two cases which debtor argues support his proffered interpretation of the pledge agreement. The first—In re Portland Newspaper Publishing Co., Inc., 3 UCC Rep.Serv. 194 (Ref.Dec.D.Or.1966), aff'd on other grounds, 271 F.Supp. 395 (D.Or.1967), aff'd sub nom., DuBay v. Williams, 417 F.2d 1277 (9th Cir. 1969)—is sufficiently dissimilar as to warrant only brief mention. While the opinion by the referee in that case contains language which would appear to lend some support to debtor's position, the circuit court affirmed on alternate grounds. Since it found that no security interest had been created in future accounts receivable, the court did not reach the question of whether the parties had effectively agreed to postpone the time of attachment.

The primary case relied upon by debtor is In re Dolly Madison Industries, Inc., 351 F.Supp. 1038 (E.D.Pa.1972), aff'd mem., 480 F.2d 917 (3d Cir. 1973). That case involved a sale of stock which was accomplished by means of the simultaneous execution of a purchase agreement, promissory note and escrow agreement. In order to secure payment of the purchase price of the stock, the purchase agreement created a security interest in the stock which was placed by the purchaser in escrow. Paragraph 1(b)(3) of the purchase agreement contained the following provision:

"In the event that AFL shall be in default in the payment of principal or interest under its promissory note . . . and if said default shall not be cured within five days after receipt by AFL of notice thereof from seller, then the escrow agent, upon notice thereof from seller, shall deliver the certificates to sell-

er, *whereupon seller's rights and obligations in and to the shares represented by the certificates . . . shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code as in effect in the Commonwealth of Pennsylvania.*" 351 F.Supp. at 1040 (emphasis added). The district court held that the italicized portion of the agreement manifested the parties' intention to delay attachment of the security interest, pursuant to § 9–204(1), until the event of an uncured default in payment. This Court affirmed the district court's decision.

■ Copeland contends that the purchase agreement in *Dolly Madison* is the "functional, factual and legal equivalent" of paragraph 8 of the pledge agreement in the instant case. Both provide, he asserts, that upon an uncured default and appropriate notice and demand, the stock is to be delivered to the secured creditor. In seeking to analogize the agreement in *Dolly Madison* to the one in the case before us, the debtor ignores the obvious differences between the two provisions. The security agreement in *Dolly Madison,* unlike the agreement in the instant case, specifically provides that in the event of default, notice, and delivery of the stock to the creditor, "the seller's rights and obligations in and to the shares represented by the certificates . . . shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code. . . ." By necessary implication, the seller achieves the status of a secured party with a perfected security interest only after default and the fulfillment of the other preconditions specified in the purchase agreement.

In contrast to the language of that agreement, paragraph 8 of the pledge agreement in the case *sub judice* neither explicitly nor implicitly postpones the attachment or perfection of the security interest. Rather, it is completely silent as to the time at which Pension Benefit achieves the status of a secured creditor with a perfected security interest. Absent an explicit agreement to

postpone the time of attachment, as required by § 9–204(1), we are reluctant to infer that the parties intended to alter the normal sequence of events by which a security interest attaches and becomes perfected under the Code. To the contrary, the evidence fully supports the district court's conclusion that the parties intended the security interest to become effective immediately. We therefore hold, as did the district court, that Pension Benefit's security interest attached in July, 1967, upon the execution of the pledge and escrow agreements.

## B. Perfection

Relying on § 9–304(1) and § 9–305, Copeland next argues that even assuming the security interest had attached, it was not properly perfected on the date of bankruptcy. Section 9–304 provides that a security interest in instruments, defined in § 9–105(1)(g) and § 8–102 to include corporate securities such as the Christiana stock, can only be perfected by the secured party's taking possession. Section 9–305 modifies this rule by permitting a secured party to perfect his security interest through the possession of his bailee. Section 9–305 states in pertinent part:

"A security interest in letters of credit and advices of credit (subsection (2)(a) of Section 5–116), goods, instruments, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. . . ."

Debtor maintains that Pension Benefit's security interest was not perfected by Wilmington Trust's possession of the stock because Wilmington Trust was the agent of both parties. He asserts that this position is inconsistent with the degree of possession needed to perfect under the "bailee with notice" provision of § 9–305. To satisfy the

requirement of this section, he urges, possession must be maintained by an agent under the sole control of the secured party.

In support of this contention, debtor places considerable emphasis upon what would have been the nature of the relationship between the parties at common law. Since the stock was held by Wilmington Trust as agent for both parties, he argues that the arrangement must be characterized as an escrow, rather than a perfected pledge which requires possession by the pledgee or an agent under his absolute dominion and control. Citing *In re Dolly Madison Industries, Inc., supra,* he further stresses that the simultaneous existence of an escrow and a pledge is a legal impossibility. Since the transaction fails as a common law pledge for lack of possession by the pledgee or his agent, and since the Code, he asserts, has incorporated the requirement of the common law pledge that the pledgee or an agent under his absolute control maintain possession of the collateral, Pension Benefit's security interest was unperfected under § 9–304 and § 9–305 on the date of bankruptcy.

Although concluding that Wilmington Trust was an escrow agent at common law and hence incapable of becoming Pension Benefit's agent for the purpose of perfecting the pledge, the district court held that the provision of § 9–305 permitting perfection by a "bailee with notice" had been satisfied, and that the security interest was consequently perfected under the Code. The court rejected debtor's argument that § 9–305 had incorporated the restrictive possession requirement of the common law pledge, finding that an acceptance of this proposition would frustrate the parties' intent to collateralize the loan as against third party creditors, would be in disregard of the policy considerations underlying both

the law of pledge and the Code, and would unduly restrict the use of the escrow device.

We find it unnecessary to consider the parties' rights at common law because we believe that the language and policy underlying § 9–305 support the district court's conclusion that Pension Benefit's security interest was perfected upon delivery of the stock to Wilmington Trust in July, 1967. While it is true that the Code does not wholly displace the common law, § 1–103, nor abolish existing security devices, Official Comment 2, § 9–102,[4] Article 9 simplifies pre-Code secured financing by providing for the unitary treatment of all security arrangements. It eliminates many of the antiquated distinctions between various security devices in favor of a single "security interest", §§ 9–102, 1–201(37), and a single set of rules regarding creation and perfection, designed to govern "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments . . . ." § 9–102. Since neither party denies that the pledge and escrow agreements were intended to create a security interest in the stock within the meaning of the Uniform Commercial Code, we attach no particular significance to the common law distinctions between the pledge and the escrow which debtor stresses, except insofar as they bear on the question of whether Pension Benefit's security interest was properly perfected under § 9–305 of the Code through Wilmington Trust's possession of the stock.

It is to that question which we now turn. Historically and prior to the Code, possession of collateral by a creditor or third party has served to impart notice to prospective creditors of the possessor's possible interest therein. The Code carries for-

---

4. While Delaware has not adopted the Official Comments prepared by the drafters of the Uniform Commercial Code, these comments are nevertheless useful in interpreting the Code, as it is to be applied in Delaware, in view of the Code's expressed purpose of making uniform the law among the various jurisdictions. § 1–

102(2)(c). Delaware has published its own comments, prepared by the Committee to Study and Report on the Uniform Commercial Code for Delaware, which appear under the heading "Delaware Study Comment", following the text of each section.

ward the notice function which the creditor's possession formerly provided. Notice to future lenders is furnished under the Code by a filed financing statement, § 9–302, or by the possession of the property subject to the security interest by a secured party or his agent, §§ 9–304, 9–305, depending upon the nature of the collateral.

■■■■■ Where the Code requires perfection by possession of the secured party or his bailee, it is clear that possession by the debtor or an individual closely associated with the debtor is not sufficient to alert prospective creditors of the possibility that the debtor's property is encumbered. *See, In re Black Watch Farms, Inc.,* 9 UCC Rep.Serv. 151 (Ref.Dec. S.D.N.Y.1971). Thus, Official Comment 2 to § 9–305 states:

"Possession may be by the secured party himself or by an agent on his behalf: it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party. . . ."

It does not follow from this statement or from the policy underlying § 9–305, however, that possession of the collateral must be by an individual under the sole dominion and control of the secured party, as debtor urges us to hold. Rather, we believe that possession by a third party bailee, who is not controlled by the debtor, which adequately informs potential lenders of the possible existence of a perfected security interest satisfies the notice function underlying the "bailee with notice" provision of § 9–305.

In the case presently before us, the collateral was held by Wilmington Trust pursuant to the terms of both the pledge and escrow agreements. Regardless of whether Wilmington Trust retained the stock as an escrow agent or as a pledge holder, its possession and the debtor's lack of possession clearly signaled future creditors that debtor's ownership of and interest in the stock were not unrestricted. As an independent, institutional entity, Wilmington Trust could not be regarded automatically as an instrumentality or agent of the debtor alone. There was consequently no danger that creditors would be misled by its possession.

The fact that debtor remained owner of record and was empowered to vote the shares and receive current income does not compel a different finding. The location of title to collateral is immaterial with respect to the rights and obligations of the parties to a security transaction. § 9–202; *Barney v. Rigby Loan & Investment Co.,* 344 F.Supp. 694 (D.Idaho 1972).

Nor do we believe our summary affirmance of the district court's decision in *In re Dolly Madison Industries, Inc., supra,* dictates a contrary conclusion. In reversing a decision by the referee denying the trustee's application for a turnover order, the district court in *Dolly Madison* rested its decision on a finding that the security agreement, *supra* pp. 1201, 1202, postponed the attachment of the security interest asserted by a creditor of the bankrupt until after bankruptcy. In support of this decision, the court noted that the parties had evidenced their intent to delay attachment by placing the collateral in the neutral custody of an escrow agent pending payment or default. Statements by the court indicating that the simultaneous existence of an escrow and a pledge is a legal impossibility were merely intended to underscore the parties' deliberate choice of the escrow device rather than a pledge in order to assure that attachment would be postponed.[5] Since the district court found that attachment had been delayed by specific agreement of the parties, it was not called upon to determine whether an attached security interest had been perfected. Hence, any statements suggesting that the placement of collateral in escrow precludes a creditor from perfecting his security interest for lack of sufficient possession under § 9–305 are mere uncontrolling dicta.

**5.** In the instant case, of course, both a pledge and an escrow agreement were executed, thereby negating a similar finding with respect to the parties' intent here.

Having found that Wilmington Trust's possession of the stock afforded the requisite notice to prospective creditors, we conclude that it was a "bailee with notice" within the meaning of § 9–305 and that its possession therefore perfected Pension Benefit's security interest. Hence, perfection occurred in July, 1967, more than three years in advance of bankruptcy, on the date the stock was delivered to Wilmington Trust with notification of Pension Benefit's interest therein. For this reason, the district court correctly concluded that debtor's interest in the stock as debtor-in-possession was subordinate to that of Pension Benefit and properly denied debtor's application for a turnover order.

## II. PENSION BENEFIT'S APPEAL

We now turn to the appeal of Pension Benefit. A brief synopsis of the events preceding this appeal is necessary to an understanding of the issues raised.

When the Christiana stock was surrendered by Wilmington Trust to Pension Benefit on December 1, 1970, following Copeland's default on the loan, its then market value was less than the amount remaining due on the loan. For this reason, Pension Benefit filed an amended proof of claim as an unsecured creditor, apparently seeking to recover the deficiency.[6] In addition, it registered the stock, which had been indorsed in blank by the debtor, in its own name or the name of its nominee, and has at all times since the date of transfer retained the stock.

A year and a half after Pension Benefit filed its amended claim, debtor filed an objection to the claim, and since the value of the stock had appreciated, simultaneously filed a counterclaim praying for injunctive relief, an evaluation of the stock pursuant to § 57h of the Bankruptcy Act, a determination of the total amount of Pension Benefit's claim, and an accounting by Pension Benefit for any surplus which might exist after satisfaction of the claim. Pension Benefit filed a motion to dismiss, contending that the counterclaim failed to state a claim upon which relief could be granted and that the debtor was barred by estoppel and laches from asserting the counterclaim.

The referee denied Pension Benefit's motion to dismiss, and partially granted the relief requested in debtor's counterclaim by scheduling an evaluation proceeding and by requiring Pension Benefit to make application to the bankruptcy court prior to any proposed sale of the stock. It specifically declined to rule at that time on debtor's prayer for an accounting in the event the value of the stock were found to exceed Pension Benefit's claim. Following the district court's affirmance of the referee's order, Pension Benefit perfected this appeal.

Underlying each of the Pension Benefit's objections to the order of the district court is its contention that its exclusive right to the stock became vested on December 1, 1970, the date the stock was delivered to it. Thereafter, it argues, the debtor had no further claim to or interest in the stock and was therefore precluded from seeking to recover its surplus value. Pension Benefit concedes in its brief that its own interest in the stock was subject to "the requirements of the secured transactions law concerning the obligation of the creditor to return any excess value to the debtor and also to sell or otherwise dispose of the collateral coming into its hands in a commercially reasonable manner. . . ."

---

**6.** Prior to its receipt of the stock, Pension Benefit had initially filed a proof of claim as a secured creditor for the entire unpaid balance on the loan. After default and delivery of the stock, Pension Benefit amended its proof of claim, listing its status as an unsecured creditor who "has not had or received any security for the debt." While the amended proof of claim nowhere states that the total amount claimed therein represents the original unpaid balance as reduced by the value of the stock on the date of its transfer to Pension Benefit, it is evident that the amended claim was intended to reflect a credit for the value of the stock. In view of our disposition of this appeal, we need not consider possible infirmities in the amended proof of claim and may treat the claim as one by a secured creditor for an alleged deficiency, as did the referee and the district court.

It stresses, however, that its retention of the stock was a "commercially reasonable disposition" in light of the depressed market and consequently in compliance with the requirements of Article 9 of the Code. For this reason, Pension Benefit contends that the referee and the district court lacked the authority to interfere with its ownership rights in the stock and to award the affirmative relief requested by the debtor.

Debtor, on the other hand, argues that in asserting his counterclaim to Pension Benefit's amended proof of claim, he is merely invoking his rights under § 9–507(1) and seeking to require Pension Benefit to dispose of the stock and account for any surplus, as required by § 9–504 of the Uniform Commercial Code.[7]

Since the validity of Pension Benefit's contention depends, in part, upon the proper interpretation and application of the default provisions of Article 9, we must first examine those provisions. In addition to permitting a secured party, in the event of default, to reduce his claim to judgment and to enforce the security interest by any available judicial procedure, § 9–501(1), Article 9 of the Code establishes two alternative methods of enforcing a security interest upon default. First, a secured party may "sell, lease or otherwise dispose of" collateral, in which case he must account to the debtor for any surplus or hold the debtor liable for any deficiency. § 9–504. Second, a secured party may make a written proposal to retain the collateral in full satisfaction of the obligation. § 9–505(2). If the debtor objects to this proposal in writing within thirty days, however, the secured party must proceed in accordance with the first alternative. § 9–505(2). The consequences of a secured party's failure to comply with these provisions are outlined in § 9–507 which provides in pertinent part:

"(1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part. . . . "

Prior to March 13, 1973, Pension Benefit neither sold the stock nor served notice upon the debtor that it proposed to retain the stock in full satisfaction of its claim pursuant to § 9–505(2). Its belated proposal to that effect on March 13 was properly rejected by debtor within thirty days. § 9–505(2). Pension Benefit was therefore obligated to "sell, lease or otherwise dispose of" the stock under § 9–504. Its duty to proceed in accordance with that section could not be waived.[8]

Pension Benefit properly concedes that the stock was not publicly "sold" or

---

**7.** As debtor-in-possession, Copeland's authority to raise objections to Pension Benefit's alleged non-compliance with the Code's default provisions derives from § 342 and § 70a of the Bankruptcy Act which collectively vest in him title to property and certain rights of action belonging to the debtor.

**8.** That debtor could not waive his right to demand that Pension Benefit proceed in accordance with the applicable default provisions of Article 9 is made explicit by § 9–501(3), which provides in part:

"(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsection referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (subsection (1) of Section 9–505) and with respect to redemption of collateral (Section 9–506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:

(a) subsection (2) of Section 9–502 and subsection (2) of Section 9–504 insofar as they require accounting for surplus proceeds of collateral;

(b) subsection (3) of Section 9–504 and subsection (1) of Section 9–505 which deal with disposition of collateral;

(c) subsection (2) of Section 9–505 which deals with acceptance of collateral as discharge of obligation; . . . . "

"leased" within the meaning of § 9–504. It argues, however, that a mere entry on its books recording the sale of stock to itself, or a sale and simultaneous purchase of the stock on the open market, would have satisfied the sale requirement of that section. While the Code permits a secured party to purchase collateral at a public sale and where, as here, it "is of a type customarily sold in a recognized market," at a private sale as well, § 9–504(3), no such sale—public or private—was in fact conducted. We therefore need not consider the available alternatives which Pension Benefit hypothetically could have pursued and which would have satisfied the sale requirement of the Code.

■ Pension Benefit argues in the alternative that by registering the stock in its own name or the name of its nominee, it has "disposed" of the stock under § 9–504 in the only "commercially reasonable" manner. While it is true that the Code requires secured creditors to proceed in a commercially reasonable manner, §§ 9–504, 9–507(2), this obligation does not displace the specific provisions of § 9–504 and § 9–505 which require a secured party to "sell, lease or otherwise dispose of" collateral, if, as here, the debtor properly objects to the secured party's proposal to retain the collateral in satisfaction of his claim. Before determining the commercial reasonableness of Pension Benefit's behavior, we must therefore first determine whether its retention of the stock and transfer of title constituted a disposition of the collateral.

No cases have been cited to us concerning the meaning of the somewhat obscure language of § 9–504(1) permitting a secured party to "otherwise dispose of" collateral in the absence of a disposition by sale or lease. However, our examination of that provision, together with the other subsections of § 9–504, indicates that it was not intended to have the sweeping application which Pension Benefit urges. For example, § 9–504(3) states that "[d]isposition of the collateral may be by public or private proceedings and may be made by way of one or

more contracts." This subsection suggests that a disposition of the collateral requires some sort of affirmative action or conduct on the part of the secured party.

A leading commentator on the law of secured transactions has stated:

"Sale of collateral is, always has been and always will be the normal default procedure. Why then does § 9–504 authorize disposition not only by sale, but by lease or 'otherwise' (although exactly what 'otherwise' includes in addition to sales and leases defeats the imagination)?" II G. Gilmore, *Security Interests in Personal Property* § 44.6, at 1336 (1965).

■ Whatever import the modifying language "or otherwise dispose of" is intended to have, we conclude that the mere retention of collateral is not the type of disposition which this provision contemplates. A contrary conclusion would obliterate the distinction which the Code draws between the consequences of a secured party's retaining and disposing of collateral. It would permit a secured party to dispose of collateral under § 9–504 by retaining it and in addition, to claim a deficiency. To sanction this course of conduct as "commercially reasonable" would contravene the Code's mandate that an effective election to retain the collateral results in a complete discharge of the underlying obligation. § 9–505(2); Official Comment 1, § 9–505.

Since Pension Benefit did not "sell, lease or otherwise dispose of" the collateral, either before or after debtor's objection to its proposed retention of the stock, it failed to comply with the duties imposed upon it as a secured creditor by the default provisions of Article 9. Its interest in the stock was therefore not immune from debtor's claim for statutory relief pursuant to § 9–507(1). We emphasize, however, that we do not decide whether the specific relief which debtor requests, i. e., an accounting for the surplus value of the stock, is appropriate. That determination must be made by the bankruptcy court in the first instance.

Having concluded that there is no merit to Pension Benefit's claim that the bank-

ruptcy court is barred from interfering with its so-called "vested" right as a secured creditor to the "unfettered" use of the stock, we now turn to Pension Benefit's specific allegations of error.

### A. Evaluation of the Stock

Again stressing that a bankruptcy court may not affect the rights of a secured creditor, Pension Benefit argues that error was committed in ordering an evaluation of the stock.

Section 57h of the Bankruptcy Act specifically authorizes the bankruptcy court to value the security held by a secured creditor where, as here, the creditor elects to avail itself of its security and at the same time participate with other general creditors as to a possible deficiency. *United States Bank of Johnstown v. Chase National Bank*, 331 U.S. 28, 67 S.Ct. 1041, 91 L.Ed. 1320 (1947). Bankruptcy Rule 306(d), which restates the rule of § 57h, provides:

> "(d) *Secured Claims.* If a secured creditor files a proof of claim, the value of the security interest held by him as collateral for his claim shall be determined by the court, and the claim shall be allowed only to the extent it is enforceable for any excess of the claim over such value."

 The bankruptcy court possesses the exclusive power to allow and disallow claims against the bankrupt estate under § 2a(2) of the Bankruptcy Act. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *In re Crystal Associates, Inc.*, 419 F.2d 60 (3d Cir. 1969). Only after an evaluation of security is completed can the amount of a deficiency asserted by a secured creditor be determined, and the claim properly allowed or disallowed.

 We therefore conclude that the district court acted in conformity with § 57h

of the Bankruptcy Act in ordering an evaluation proceeding incidental to the determination of Pension Benefit's deficiency claim and debtor's counterclaim thereto. We further note that arguments advanced by each party as to the appropriate date upon which the stock should be valued are premature. Since neither the referee nor the district court formally ruled on the proper valuation date, that issue is not before us here.

### B. Prior Court Approval of Disposition

Pension Benefit next argues that the district court's order requiring it obtain the referee's prior approval before any proposed disposition of the stock was an unwarranted interference with its right as a secured party to do with the stock whatever it wished. A resolution of this contention requires us first to examine the precise theories on which debtor's prayer for injunctive relief in his counterclaim was based.

 Debtor's first prayer in his counterclaim requests that Pension Benefit be enjoined from selling or otherwise disposing of the stock pursuant to § 57h of the Bankruptcy Act [9] in order to preserve the status quo pending the court's determination of the appropriate valuation method. Alternatively, debtor seeks to enjoin the sale of the stock pursuant to § 9–507(1) of the Uniform Commercial Code in anticipation of a possible order requiring Pension Benefit to apply the proceeds of the stock against its claim and account to debtor for the surplus. Since the district court failed to articulate the legal basis on which its stay order was issued, we must ascertain whether the order may be sustained on either theory advanced by debtor.

In support of his first theory, debtor argues that the power to restrain a secured creditor's disposition of collateral is ancil-

---

**9.** Section 57h provides:

"h. The value of securities held by a secured creditor shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors

. . . and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance. Such determination shall be under the supervision and control of the court."

lary to the bankruptcy court's power to supervise and direct an evaluation proceeding. Assuming that situations may exist in which injunctive relief would be justified as incidental to the evaluation of collateral under § 57h of the Bankruptcy Act, see, In re R & L Engineering Co., 182 F.Supp. 317 (S.D.Cal.1960), we believe that there is no basis on the present record for sustaining such an order in this case.

■ Debtor argues in the alternative that injunctive relief is appropriate to preserve the status quo until the court determines whether the value of the stock exceeds the amount of Pension Benefit's claim and, if so, whether the surplus must be returned to debtor. The exercise of injunctive power on this basis can only be justified as ancillary to the principal relief requested in the counterclaim, i. e., an accounting for any surplus which is found to exist after a determination of the amount of Pension Benefit's claim and an evaluation of the stock. For this reason, we believe that before an injunction issues, there must be a prior determination that the court has jurisdiction to award the ultimate relief requested and that there is a substantial possibility of success which would render a temporary preservation of the status quo desirable.

■ In the instant case, however, the bankruptcy court specifically refrained from deciding whether summary jurisdiction existed to order the affirmative relief which debtor requested. Clearly, in cases where a creditor has filed a proof of claim with the bankruptcy court, that court may entertain summary jurisdiction over an appropriate counterclaim, where the counterclaim arises out of the transaction that is the subject matter of the creditor's claim. See, In re Carnell Construction Corp., 424 F.2d 296 (3d Cir. 1970). The extent to which the court has summary jurisdiction to award affirmative relief on the counterclaim, however, other than in a preference

context, remains unclear. See, Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); In re Solar Mfg. Co., 200 F.2d 327 (3d Cir. 1952).

If the bankruptcy court should conclude that it lacks summary jurisdiction to order a return of any possible surplus, then the court's stay order could not be justified as incidental to the effectuation of a final decree. Despite the court's finding that a resolution of the jurisdictional issue would be premature in view of the possibility that debtor's counterclaim might otherwise fall for lack of a surplus, we believe that it was inappropriate to grant an indefinite injunction without first deciding whether jurisdiction existed to award the affirmative relief requested. A threshold determination by the court as to its jurisdiction must precede any ruling on a non-jurisdictional basis.[10] See, Pacific Intermountain Express Co. v. Hawaii Plastics Corp., 528 F.2d 911 (3d Cir. 1976). In view of the absence of such a determination by the district court, we conclude that the stay order cannot be upheld on the alternative theory advanced by debtor. Accordingly, on this record, the order must be vacated, without prejudice, insofar as it requires Pension Benefit to obtain the court's approval before disposing of the collateral.

### C. Motion To Dismiss Debtor's Counterclaim

■ It follows from what we have said that the district court properly denied Pension Benefit's motion to dismiss the counterclaim for failure to state a claim, at least insofar as the counterclaim requested that the court determine the total amount of Pension Benefit's claim, supervise a valuation of the stock, and restrain Pension Benefit's disposition of the stock without prior court approval. We say this even though there is no basis on the present record to support the district court's grant of injunctive relief.

Pension Benefit also contends, however, that the court erred in denying its motion

---

10. We do not challenge the power of the court to maintain the status quo until it has the opportunity to resolve a jurisdictional challenge.

to dismiss debtor's prayer for an accounting. It argues that this portion of the counterclaim fails to state a claim upon which relief can be granted, since even if the value of the stock is determined to exceed the total claim against the debtor, the bankruptcy court is precluded from awarding debtor the surplus.

■ The bankruptcy court treated Pension Benefit's motion to dismiss as jurisdictional in nature, finding that the primary thrust of its argument was that the bankruptcy court lacked summary jurisdiction to grant the relief requested by debtor. After determining that summary jurisdiction existed to determine the total amount of Pension Benefit's claim and to order an evaluation of the stock, the court reserved judgment on the issue of whether summary jurisdiction existed to compel Pension Benefit to account to debtor for any excess in the value of the stock. Although Pension Benefit urges us to decide that issue here, and in addition, assuming jurisdiction exists, to decide the validity of debtor's prayer for an accounting, we decline as those issues are not properly before us.

A word of caution, however, is necessary. While finding that a resolution of the accounting issue would be hypothetical and advisory, the bankruptcy court nevertheless intimated, without citation to legal authority, that if the value of the stock exceeds the amount of Pension Benefit's claim, "there appears to be no reason why the court should not exercise its summary jurisdiction and order Pension Benefit to pay the surplus to Debtor . . . ." Presumably, the court was relying on the theory of recovery advanced by the debtor, i. e., that Pension Benefit was obligated to proceed in accordance with the default provisions of Article 9 by disposing of the collateral and accounting to debtor for any surplus. *See,* §§ 9–507(1), 9–504. Although it is true that Pension Benefit failed to comply with the applicable requirements of Article 9 in enforcing its security interest, we are not now called upon to express any opinion as to the appropriate remedy under § 9–507 for noncompliance with those requirements.

### D. Estoppel and Laches

■ In addition to arguing that the counterclaim fails to state a claim upon which relief can be granted, Pension Benefit also contends that debtor is barred by estoppel and laches from seeking the requested relief.[11] In substance, Pension Benefit argues that it has suffered prejudice because the debtor deliberately refrained from seeking to compel it to sell the stock until such time as the value of the stock exceeded the amount of its claim. It reasons that if debtor had raised this claim in a timely fashion, any "technical" requirements mandated by the Code could have been satisfied at that time and its right to the appreciation in value of the stock would now be manifest.

We think the bankruptcy court correctly determined that, "[a]ny prejudice which occurred was occasioned not by the act or failure to act of Debtor, but by reason of the failure of Pension Benefit to act in accordance with its pledge agreement and applicable law." Moreover, if Pension Benefit receives complete repayment on the loan, it is difficult to see how it has suffered a prejudicial change of position because of any delay charged to the debtor. We therefore conclude that the district court properly rejected Pension Benefit's estoppel and laches defenses.

The order of the district court denying debtor's application for a turnover order will be affirmed. Insofar as the order of the district court denies Pension Benefit's motion to dismiss debtor's counterclaim and awards debtor partial summary judgment, it will be affirmed. Insofar as the order of the district court requires Pension Benefit to make application to the bankruptcy court prior to any proposed sale or disposition of

---

11. Pension Benefit raises identical objections to debtor's application for a turnover order. Our affirmance of the denial of his application, however, has rendered a consideration of those objections unnecessary.

the stock, it will be vacated without prejudice.