In re GEORGE B. KERR, INC., Debtor.

J.P. HODGES, as Chairman of Creditors' Committee, Plaintiff,

v.

Robert F. ANDERSON, Trustee for George B. Kerr, Inc. and First National Bank of South Carolina, Defendants.

Bankruptcy No. 81–00031.
Adv. No. 81–0048.

United States Bankruptcy Court,
D. South Carolina.

Dec. 14, 1981.

Charles Porter and Brenton D. Jeffcoat, McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble, P.A., Columbia, S.C., for plaintiff.

Robert F. Anderson, Anderson & Robinson, P.A., Columbia, S.C., for defendant trustee.

Hamilton Osborne, Jr., Boyd, Knowlton, Tate & Finlay, Columbia, S.C., for defendant bank.

## ORDER FOR SUMMARY JUDGMENT

J. BRATTON DAVIS, Bankruptcy Judge.

This matter is before the court upon the motion of First National Bank of South Carolina ("First National") for summary judgment. For the reasons hereinafter set forth, the court concludes that the motion should be granted.

George B. Kerr, Inc., (the debtor) a grain dealer, was discovered to be insolvent following the death of its president and principal shareholder, George B. Kerr, on January 7, 1981. The debtor's petition for relief pursuant to Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 1101 *et seq.*) was filed on January 12, 1981, and Robert F. Anderson has been appointed by the court as the Trustee of the debtor's estate.

The plaintiff J.P. Hodges, as Chairman of the Creditors' Committee, commenced this adversary proceeding to recover certain payments made to First National by the Trustee. At the time the debtor's petition for relief was filed, First National held numerous warehouse receipts issued to the debtor by the Department of Agriculture of the State of South Carolina. The warehouse receipts represented corn, soybeans and wheat stored by the debtor in state warehouse number 1478–G and were delivered to First National for the purpose of securing a loan made to the debtor by First National. At the time the debtor's petition

for relief was filed, the amount owed on the loan secured by the warehouse receipts exceeded $1,000,000; and the value of the commodities represented by the receipts exceeded the amount owed on the loan.

The Trustee could not obtain possession of the commodities represented by the receipts without first recovering the warehouse receipts from First National, and First National would not release the receipts unless the loan was repaid. The Trustee repaid the loan, recovered the receipts, and sold the commodities represented by the receipts. The actions of the Trustee saved the debtor the expense of the interest which was accruing on the loan and the expense of continuing to store the commodities. The actions of the Trustee also preserved for the unsecured creditors the equity of the debtor in the commodities.

The plaintiff, asserting that First National does not have a valid security interest in the warehouse receipts or the commodities represented thereby, seeks to require First National to refund to the Trustee the payments made to First National by the Trustee in order to redeem the warehouse receipts.

At a hearing held on the motion for summary judgment, counsel for all parties submitted a written stipulation of facts and acknowledged that there are no material issues of disputed fact—all disputes being issues of law. Disposition of this adversary proceeding on motion for summary judgment is, therefore, appropriate.

On the basis of the stipulated facts, the affidavits filed in support of the motion for summary judgment, and the deposition testimony of Pat M. Rogers, the court finds as a matter of fact, and concludes as a matter of law, as follows:

## FINDINGS OF FACT

1. First National was the holder of two demand promissory notes executed by George B. Kerr, Inc. The first note, dated January 11, 1980, was for the principal amount of $1,000,000. The second note, dated September 6, 1980, was for the principal amount of $500,000.

2. Both notes were secured by written security agreements pursuant to which the debtor delivered to First National from time to time various warehouse receipts for agricultural commodities issued to the debtor by the State of South Carolina Department of Agriculture. The security agreements describe, as collateral, specific warehouse receipts, some of which were held by First National when the debtor's petition for relief was filed. Other warehouse receipts which were held by First National are not described specifically in the security agreements. The security agreements also do not describe, as collateral, the commodities represented by the warehouse receipts.

3. The financing statements which were executed by the debtor described all warehouse receipts delivered to First National by the debtor and the agricultural commodities covered thereby and were filed in the offices of the Secretary of State of South Carolina and the Clerk of Court for Marlboro County. The last financing statement was filed in the office of the Secretary of State of South Carolina on January 13, 1981, which was the day after the filing of the debtor's petition for relief. That financing statement describes four warehouse receipts and a total of 30,000 bushels of soybeans.

4. Before making any advances upon either of the demand promissory notes described above, First National always required that sufficient warehouse receipts be delivered to First National so that the total amount of advances on the notes would not exceed 85% of the market value of the warehouse receipts assigned to and held by First National.

5. At the time the debtor's petition for relief was filed, the amount owed upon the promissory note, dated January 11, 1980, was $1,102,865.56 principal plus $61,637.47 accrued interest, and the amount owed on the note, dated September 16, 1980, was $500,000 principal plus $15,497.93 accrued interest. The Trustee has paid First National all amounts owed upon the notes except attorney's fees, which have not yet been determined.

6. The warehouse receipts delivered to First National were issued by Mrs. Patricia M. Rogers, who was both general manager for the debtor and warehouse manager for the State of South Carolina Department of Agriculture. Each warehouse receipt had a serial number, and Mrs. Rogers kept a record of the name of the person to whom each receipt was issued.

7. Each of the warehouse receipts bears a legend stating:

Under the Statute Laws of South Carolina, this receipt carries absolute title to the products herein described which will be delivered only upon presentation of this receipt and payment of all warehouse charges and expenses.

Each warehouse receipt was issued to the debtor in its name, and each receipt bears a similar handwritten endorsement in the name of the debtor on the reverse side.

8. Mrs. Rogers identified a typical endorsement appearing on the reverse of one of the warehouse receipts as an endorsement in the name of the debtor by George B. Kerr, president of the debtor. She stated that, in her understanding, endorsement of the receipt in that form and delivery of the receipt to First National gave First National title to the receipt as collateral.

9. Mrs. Rogers was aware that the warehouse receipts which she issued to the debtor were pledged to First National from time to time to secure debt owed by the debtor to First National. She knew when a receipt had been delivered to First National because she usually sent it. At the time of Mr. Kerr's death on January 7, 1981, Mrs. Rogers knew which warehouse receipts were held by First National.

10. The agricultural commodities represented by the warehouse receipts held by First National were stored in storage facilities owned by the debtor and leased to the South Carolina Department of Agriculture pursuant to a written and recorded lease agreement. As manager of the warehouse facilities leased by the debtor to the South Carolina Department of Agriculture, Mrs. Rogers was under the direct and exclusive supervisory control of the South Carolina Commissioner of Agriculture and the Director of Warehouses of the South Carolina Department of Agriculture.

11. The warehouse receipts held by First National were delivered to First National by the debtor for the express purpose of securing the debt owed on the promissory notes previously described.

12. It is the custom and usage of trade in the agricultural commodities marketing business to treat warehouse receipts issued by the South Carolina Department of Agriculture as negotiable documents of title. It is also the custom and usage of trade in the agricultural commodities marketing business for dealers in agricultural commodities to use such receipts in financing arrangements with banks to insure necessary cash flow to conduct their businesses, pledging the receipts as collateral.

## CONCLUSIONS OF LAW

A. *The security interest of First National was enforceable and perfected because the warehouse receipts in the possession of First National were negotiable.*

During the period that goods are in the possession of the issuer of a negotiable document therefor, a security interest in the goods is perfected by perfecting a security interest in the documents, and any security interest in the goods otherwise perfected during such period is subject thereto. Section 36–9–304(2), Code of Laws of South Carolina (1976). A security interest in negotiable documents may be perfected by the secured party's taking possession of the documents or by its filing a financing statement describing the documents. Sections 36–9–302(1)(a), –304(1), and –305, Code of Laws of South Carolina (1976). If the documents are in the possession of the secured party, no written security agreement is necessary. Section 36–9–203(1), Code of Laws of South Carolina (1976). The term "documents" includes warehouse receipts. Sections 36–1–201(15) and 36–9–105(1)(e), Code of Laws of South Carolina (1976).

■ A warehouse receipt is negotiable if, by its terms, the goods are to be delivered to bearer or to the order of a named person. Section 36–7–104(1)(a), Code of Laws of South Carolina (1976). The term "bearer" includes the person in possession of a warehouse receipt endorsed in blank. Section 36–1–201(5), Code of Laws of South Carolina (1976). A warehouse receipt need not be in any particular form. Section 36–7–202(1), Code of Laws of South Carolina (1976).

■ The warehouse receipts pledged to First National by the debtor were negotiable because they represented absolute title to the goods, were issued to the debtor, were endorsed by the debtor in blank, and were delivered to First National. Since the goods represented by the receipts could be obtained only upon presentation and surrender of the receipts, the goods were to be delivered to the bearer of the receipts. The receipts thus meet the requirements for negotiability.

■ The plaintiff has asserted that the receipts are not negotiable because they do not contain the word "order" or the word "bearer." We find no support for this assertion in the Uniform Commercial Code or in the case law decided thereunder. As previously stated, a warehouse receipt is negotiable if, by its terms, the goods are to be delivered to the bearer of the receipt. There is no requirement that the word "bearer" or any other specific word appear in the receipt. If a receipt is endorsed in blank by the person to whom it is issued, the goods are to be delivered to the bearer, and the receipt is negotiable, regardless of whether it contains the word "bearer."

The plaintiff has cited the case of *R.E. Huntley Cotton Co. v. Fields*, 551 S.W.2d 472 (Tex.Civ.App.1977), as support for the proposition that a receipt must contain the word "order" or the word "bearer" in order to be negotiable. The case does not support this proposition. The decision held merely that a warehouse receipt which stated that the goods would be delivered "to the named depositor or its order, or bearer" was negotiable. The decision does not say—even in

*dictum*—that the omission of the words "order" and "bearer" would have rendered the receipt nonnegotiable.

B. *Even if the warehouse receipts were nonnegotiable, First National had a perfected security interest in the commodities covered by the receipts.*

■ A security interest in goods in the possession of a bailee who has not issued a negotiable document of title therefor may be perfected by the bailee's receipt of notification of the secured party's interest or by the filing of a financing statement as to the goods. Section 36–9–304(3), Code of Laws of South Carolina (1976). The commodities covered by the warehouse receipts pledged to First National by the debtor were in the possession of the State of South Carolina Department of Agriculture as bailee, and the security interest of First National in the commodities was perfected both by notice to Mrs. Rogers, the agent of the bailee, and by the filing of financing statements.

■ A security interest is not enforceable unless the collateral is in the possession of the secured party or the debtor has signed a security agreement which contains a description of the collateral. Section 36–9–203(1), Code of Laws of South Carolina (1976). If collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession of the collateral from the time the bailee receives notification of the security interest. Section 36–9–305, Code of Laws of South Carolina (1976). Consequently, even if the warehouse receipts pledged to First National by the debtor were nonnegotiable, no written security agreement was required to render the security interest of First National enforceable because the commodities covered by the receipts were in the possession of a bailee who had notice of the security interest of First National.

■ The plaintiff has asserted that the security interest of First National in the commodities stored by the debtor was not perfected because Mrs. Rogers was under

the control of the debtor and was not an independent bailee. This assertion is erroneous for two reasons: first, the bailee was the State of South Carolina Department of Agriculture, not Mrs. Rogers; and second, Mrs. Rogers was responsible to the State of South Carolina (not to the debtor) for the operation of the warehouse in which the commodities were stored. The plaintiff has cited the case of *In re Copeland,* 531 F.2d 1195 (3d Cir.1976), in support of his position. However, that case held only that possession of the collateral by a third party bailee who was not controlled by the debtor was sufficient to perfect a security interest. The court expressly rejected the proposition that possession of the collateral by a bailee under the sole dominion and control of the secured party was required. Since the South Carolina Department of Agriculture was not controlled by the debtor in this case, the commodities in which First National had a security interest were in the possession of an independent bailee.

■ The plaintiff has argued that Mrs. Rogers' receipt of notification of First National's security interest was insufficient to perfect the security interest because Mrs. Rogers did not, in turn, notify the South Carolina Department of Agriculture. The record in this case contains no evidence of whether Mrs. Rogers notified the South Carolina Department of Agriculture of the security interest, but no such notification was required because Mrs. Rogers was the agent of the Department of Agriculture for receipt of notice. The Uniform Commercial Code states that "Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction . . . ." Section 36–1–201(27), Code of Laws of South Carolina (1976). As used in the Uniform Commercial Code, the term "organization" includes a government or governmental subdivision or agency. Section 36–1–201(28), Code of Laws of South Carolina (1976). Since Mrs. Rogers was the agent of the South Carolina Department of Agriculture which issued the warehouse receipts held by First National,

she was the appropriate person to receive notice of a security interest in the commodities represented by the receipts.

Regardless of whether the commodities represented by the warehouse receipts were in the possession of an independent bailee, the security interest of First National was evidenced by written security agreements and perfected by the filing of financing statements. The two documents designated as security agreements, which were signed by the debtor, described only certain warehouse receipts and not the commodities covered thereby. However, there is sufficient additional documentation to satisfy the requirement of a written security agreement signed by the debtor and describing the collateral.

At least one court has held that a financing statement signed by the debtor satisfies the requirement of a written security agreement. *In re Amex-Protein Development Corp.,* 504 F.2d 1056 (9th Cir.1974). Taking a more moderate approach, other courts have held that although a financing statement which merely describes the collateral is not alone sufficient to satisfy the requirement of a written security agreement signed by the debtor, the requirement can be satisfied by also considering the financing statement and the other documentation relating to the debt. *In re Bollinger Corp.,* 614 F.2d 924 (3d Cir.1980); *In re Numeric Corp.,* 485 F.2d 1328 (1st Cir.1973); *In re Carmichael Enterprises, Inc.,* 334 F.Supp. 94 (N.D.Ga.1971), *aff'd per curiam,* 460 F.2d 1405 (5th Cir.1972).

■ The debtor signed and delivered to First National the following documents: (i) two notes reciting that they were secured by written security agreements; (ii) two written security agreements describing certain warehouse receipts; (iii) numerous warehouse receipts describing certain agricultural commodities stored in a particular warehouse; and (iv) various financing statements describing each of the warehouse receipts and the commodities covered thereby.

The intent of the debtor to grant a security interest to First National in the commodities described in the warehouse receipts and in the financing statements is clear. All of the documents taken together satisfy the requirement of a written security agreement signed by the debtor and describing the collateral.

Although the plaintiff has asserted that the financing statements do not describe the commodities adequately, such assertion is erroneous. Each financing statement describes the commodities in both quantity and kind, *e.g.*, 5,000 bushels of soybeans. The descriptions are sufficient— all that is required under the Uniform Commercial Code is that the financing statement be sufficiently descriptive so as reasonably to generate further inquiry. *In re Varney Wood Products, Inc.*, 458 F.2d 435 (4th Cir.1972).

The only financing statement which appears to be in any way defective is the financing statement which was filed on the day after the debtor's petition for relief was filed. The filing of the financing statement after the filing of the petition is ineffective because of the automatic stay imposed by section 362(a) of the Bankruptcy Code. (11 U.S.C. § 362(a).) However, it is not necessary to consider this financing statement because, as discussed above, there are alternate grounds for holding that the security interest of First National was perfected even in the absence of any of the financing statements.

### ORDER

For the foregoing reasons, it appears that First National is entitled to summary judgment against the plaintiff, and this adversary complaint should be dismissed with prejudice.