In re The JULIEN COMPANY, Debtor.

Jack F. MARLOW, Trustee, Plaintiff,

v.

ROLLINS COTTON COMPANY, A DI-
VISION OF LOR, INC., Defen-
dant/Third Party Plaintiff,

v.

BANKERS TRUST COMPANY and L
& S Cotton Systems, Inc., Third
Party Defendants.

No. 94–2740 M1/Bre.

United States District Court,
W.D. Tennessee,
Western Division.

Oct. 31, 1996.

Thomas H. Fulton, John R. Dunlap, Humphreys Dunlap Wellford Acuff & Stanton, P.C., Memphis, TN, Jerome L. Kaplan, Allen I. Hirsch, Arnall Golden & Gregory, Atlanta, GA, for Rollins Cotton Co.

David Blaylock, Glankler Brown Gilliland Chase Robinson & Raines, Memphis, TN, for Julien Co.

Lee L. Piovarcy, William J. Landers, Robert E. Orians, Martin Tate Morrow & Marston, Memphis, TN, Richard A. Rosen, Edard S. Zas, Paul Weiss Rifkind Wharton Garrons, New York City, for Bankers Trust Co.

Saul C. Belz, Waring Cox, Memphis, TN, for L & S Cotton Systems, Inc.

## ORDER AFFIRMING BANKRUPTCY COURT'S OPINION

McCALLA, District Judge.

The trustee and Bankers Trust Company appeal the bankruptcy court's decision finding that two pre-petition transfers, totalling

approximately $22 million, from the debtor to Rollins Cotton Company were not avoidable transfers under 11 U.S.C. § 547(b). The issue on appeal is whether the bankruptcy court erred in concluding that Rollins Cotton Company was a fully secured creditor at the time of the two transfers. For the reasons set forth below, the decision of the bankruptcy court is affirmed.

## BACKGROUND

During April and May 1989, Rollins Cotton Company ("Rollins") sold several thousand bales of cotton to The Julien Company ("Julien"), which Julien, in turn, sold to various third parties. Julien subsequently decided to repurchase the cotton that it had sold and requested that Rollins finance the transaction. Rollins agreed and, in July 1989, financed Julien's repurchase of approximately 65,000 bales of certificated cotton.[1] As security for the approximately $22 million in financing, Rollins took physical possession of warehouse receipts [2] representing the certificated cotton purchased for Julien ("certificated receipts").[3] Payment from Julien to Rollins for financing the repurchase was originally due in late September 1989, but the parties subsequently extended the due date until October 1989.[4]

In August 1989, Julien decided to "decertificate," and subsequently "recertificate," the cotton that it had repurchased in order to remove the overage penalties that were accruing on the cotton.[5] Julien proposed to Rollins that Rollins relinquish possession of the certificated receipts in order to facilitate the decertification/recertification process. In return, Julien would provide Rollins with two non-negotiable farmer's trust receipts issued by L & S Cotton Systems, Inc. ("L & S") as substitute collateral.[6] The farmer's trust receipts represented warehouse receipts for uncertificated cotton ("uncertificated receipts"), which were held by L & S, that had the same total value as the surrendered certificated receipts.[7] Rollins agreed to the transaction and, after receiving the two farmer's trust receipts from L & S, sent the certificated receipts directly to Julien.

The relationship between Julien, Bankers Trust Company ("Bankers Trust"), and L & S merits discussion at this point. In the 1980s, Bankers Trust and a group of other banks made loans to Julien. Bankers Trust

1. Certificated cotton is cotton that has been classified by the government as tenderable on the New York futures market.

2. A warehouse receipt is "a receipt issued by a person engaged in the business of storing goods for hire." Tenn.Code Ann. § 47–1–201(45) (1996). The holder of a negotiable warehouse receipt is entitled to the goods represented by such documents. Id. § 47–7–403. Thus, a commodity producer will often store his product with a warehouseman, who then issues a warehouse receipt to the producer, which allows vast quantities of goods to be sold and purchased simply through the use of warehouse receipts. James J. White & Robert S. Summers, Uniform Commercial Code § 20–4 (1980). In the present case, the warehouse receipts were negotiable, bearer instruments that represented ownership of a specifically identified bale of cotton.

3. Rollins received the warehouse receipts directly from the third party sellers as it paid for the cotton.

4. The agreement between Rollins and Julien provided that if Julien could sell the repurchased cotton at a profit before the first notice day in October 1989, Rollins would be paid in full for financing the repurchase, and any profit made on the sale would be divided between Rollins and

Julien. Conversely, if Julien could not sell the cotton at a profit, Rollins was still to be paid in full for financing the cotton repurchase. As it turned out, the agreement between Rollins and Julien was a financing arrangement.

5. The decertification process requires that the party seeking to decertify cotton notify the proper cotton exchange that the cotton is to be removed from the certificated classification. The party may then resubmit the cotton for classification by the United States Department of Agriculture ("USDA"). If the cotton is certified by the USDA, the cotton is recertificated and all overage penalties are removed.

6. Farmer's trust receipts represent cotton documents, not specific bales of cotton, and were issued to evidence that cotton documents or warehouse receipts were in L & S's possession, but were held for some other purpose. The farmer's trust receipts represented a commitment that a certain number of documents were available.

7. Because uncertificated cotton is worth less than certificated cotton, the exchange was 68,-640 uncertificated receipts for the 62,400 certificated receipts held by Rollins.

was appointed as the custodian of a pool of cotton documents, including warehouse receipts and other documents, in which Bankers Trust and the other lenders held pro rata security interests as collateral for the loans. L & S was appointed by Bankers Trust to act as a collateral sub-custodian, holding warehouse receipts and other cotton documents deposited into the collateral pool by Julien and Bankers Trust. L & S was responsible for keeping track of the number of warehouse receipts and other cotton documents in its physical possession. The sub-custodial agreement allowed L & S to transmit cotton documents to permit the trading of cotton, to permit Julien access to the cotton documents, and to allow Julien to withdraw cotton documents under certain circumstances. When Julien withdrew warehouse receipts, L & S issued internal trust receipts, which enabled Julien to withdraw the warehouse receipts without affecting the security interests of the lenders.[8]

The two farmer's trust receipts issued by L & S to Rollins represented 68,640 uncertificated receipts in L & S's inventory. The first farmer's trust receipt was dated August 15, 1989;[9] the second was dated August 23, 1989.[10] L & S's collateral report number 315, which it prepared as part of its accounting and reporting duties in the ordinary course of business, reflected that on August 16, 1989, a deduction was made in the collateral pool corresponding to the issuance of the August 15 farmer's trust receipt. Collateral report number 322 reflected a similar deduction made on August 25, 1989, pursuant to the August 23 farmer's trust receipt. Subsequent collateral reports continued to reflect the deductions made by L & S. L & S's records further reflected an entry of receipt of the certificated receipts from Rollins and that the documents were "in transit." In addition, at all times between August 1, 1989, and November 1, 1989, L & S had at least 68,640 uncertificated receipts in its possession. Thus, L & S had "blocked" 68,640 uncertificated receipts on account of the farmer's trust receipts issued to Rollins.[11]

On October 24, 1989, Julien wired $1.215 million to Rollins; Julien wired an additional $20,813,569.52 to Rollins on October 26, 1989, thereby satisfying its obligation to Rollins for the cotton repurchase. Rollins returned the two farmer's trust receipts to Julien on October 27, 1989. As reflected in an October 30, 1989 collateral report, L & S "unblocked" the 68,640 uncertificated receipts after Rollins was paid by Julien and had returned the farmer's trust receipts.

Julien's financial condition subsequently deteriorated, however, and, on January 10, 1990, an involuntary petition under the bankruptcy code was filed against Julien requesting an order of relief under chapter 11. Jack Marlow was appointed as the chapter 11 trustee.

On April 10, 1990, the trustee filed a complaint against Rollins seeking to avoid the

---

**8.** Under such circumstances, L & S's collateral reports listed the documents as being "in transit," and a transit letter accompanied the documents, notifying third parties of the lenders' collateral interest in the documents.

**9.** The August 15, 1989 farmer's trust receipt prepared by L & S provided:

This is to certify that Rollins Cotton of _____ has delivered to the undersigned, for the account of THE JULIEN COMPANY in care of L & S COTTON SYSTEMS warehouse receipts and/or compress receipts and/or negotiable bills of lading calling for thirty-two thousand and two hundred (32,200) bales of cotton of various marks.
It is understood and agreed that the above documents are held in trust and that THE JULIEN COMPANY shall have the privilege of exchanging or substituting said collateral from time to time for warehouse receipts or other documents covering an equivalent number of bales of cotton, and shall be permitted to withdraw documents on their trust receipts for the purpose of making shipments.
It is further understood that the undersigned is acting only as custodian and assumes no responsibility for the genuineness or validity of the documents submitted or for the weight, grade, character, condition or value of cotton covered thereby.
This receipt is to be returned to the undersigned upon release of the above mentioned documents.

**10.** The August 23, 1989 farmer's trust receipt was identical to the August 15 trust receipt, except that it was for 36,440 bales of cotton.

**11.** The bankruptcy court found that Bankers Trust had agreed to the dilution of its collateral pool in this way in order to facilitate the Julien/Rollins transaction.

two October transfers from Julien to Rollins under 11 U.S.C. § 547(b). On May 25, 1990, Rollins filed an answer and a third-party complaint against L & S and Bankers Trust. Rollins subsequently moved for summary judgment, contending that, because it was a secured creditor at the time of the two transfers, the two transfers were not avoidable under § 547(b). The bankruptcy court granted Rollins's motion for summary judgment, but was reversed on appeal.[12] After denying Rollins's second motion for summary judgment, the bankruptcy court set the matter for trial. Following the trial, at which the parties submitted on stipulations, affidavits, depositions, and documents and presented no live testimony, the bankruptcy court issued a memorandum opinion concluding that Rollins was a fully secured creditor at the time of the two transfers and that, therefore, the transfers were not avoidable under § 547(b).[13] The trustee and Bankers Trust appealed.

## DISCUSSION

The trustee and Bankers Trust contend that, because Rollins did not have a written security agreement with Julien and did not have physical possession of any collateral securing Julien's $22 million obligation at the time of the two transfers, the bankruptcy court erred in concluding that Rollins was a fully secured creditor at the time of the two transfers. Thus, the trustee and Bankers Trust argue, the two transfers are avoidable under § 547(b). When reviewing bankruptcy court decisions, a district court is bound by the bankruptcy court's findings of fact unless they are clearly erroneous; conclusions of law, however, are reviewed *de novo*. *In re Batie*, 995 F.2d 85, 88 (6th Cir.1993).

Under the bankruptcy code, a trustee has "extensive power to avoid certain

pre-petition transactions which adversely affect the bankruptcy estate," *In re Virginia–Carolina Fin. Corp.*, 954 F.2d 193, 196 (4th Cir.1992), including the power to avoid preferential transfers under 11 U.S.C. § 547(b). Under § 547(b), a trustee may "recover for the benefit of the estate certain payments made by a debtor to a creditor within the 90 days preceding the filing of the bankruptcy." *In re LCO Enters.*, 12 F.3d 938, 941 (9th Cir.1993).[14] Specifically, § 547(b) provides that,

the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

In order to avoid a particular transfer, the trustee has the burden of proving each of the elements of § 547(b). 11 U.S.C. § 547(g). In the present case, however, only § 547(b)(5) is disputed.[15]

---

**12.** This Court found that the bankruptcy court erred in granting summary judgment because there were genuine issues of material fact.

**13.** Judgment was entered on May 6, 1994.

**14.** A transfer made by the debtor to a creditor during this period is "preferential" because the creditor generally receives full payment and does not have to share pro rata with other creditors of the bankruptcy estate. *See, e.g., In re Martin*,

184 B.R. 985, 990 (M.D.Ala.1995) (explaining that the policy behind allowing the trustee to avoid preferential transfers is to ensure "that all creditors receive an equal distribution from the available assets of the debtor").

**15.** The parties stipulated that all of the elements of § 547(b) have been proven, except for § 547(b)(5).

■ To determine whether the trustee has established § 547(b)(5), a court is required to "construct a hypothetical chapter 7 case and determine what the creditor would have received if the case had proceeded under chapter 7." *LCO Enters.*, 12 F.3d at 941.[16] Section § 547(b)(5) is established when the amount of the actual pre-petition transfer exceeds the amount the creditor would have received under the hypothetical chapter 7 liquidation. *See id.* In a chapter 7 liquidation, however, a fully secured creditor is entitled to receive full payment on its claim. *In re Hale*, 15 B.R. 565, 567 (Bankr. S.D.Ohio 1981). Thus, "as a general rule payments to a fully secured creditor during the 90 day period preceding the filing of bankruptcy will not be considered a preferential transfer." *Id.*[17] Therefore, if Rollins was a fully secured creditor at the time of the transfers from Julien, the two pre-petition transfers did not enable Rollins to receive more than it would have received in a chapter 7 liquidation, and, if so, § 547(b)(5) cannot be established and the transfers are not avoidable. *See Hale*, 15 B.R. at 567. Accordingly, state law must be examined to determine whether Rollins was a fully secured creditor at the time of the two transfers. *See In re Battery One–Stop Ltd.*, 36 F.3d 493, 495 (6th Cir.1994).

The bankruptcy court concluded that Rollins was a fully secured creditor at the time of the two transfers because it held a perfected security interest in collateral,[18] the 68,640 uncertificated receipts, which secured Julien's $22 million obligation to Rollins for financing the cotton repurchase. The bankruptcy court reasoned that, although Rollins did not have physical possession of the uncer-

tificated receipts, L & S held the uncertificated receipts as a bailee for Rollins, which was sufficient to create and perfect a security interest in favor of Rollins in the 68,640 uncertificated receipts. As explained below, Rollins held a valid security interest in the 68,640 uncertificated receipts held by L & S.

■ Under Tennessee law,[19] a security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." Tenn.Code Ann. § 47–1–201(37)(A).[20] Section 47–9–203(1), provides that:

a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless: (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . ., and (b) the value has been given; and (c) the debtor has rights in the collateral.

The trustee and Bankers Trust argue that, because Rollins, the secured party, did not have physical possession of the 68,640 uncertificated receipts, Rollins's security interest in the uncertificated receipts could not have attached given the language and policies of § 47–9–203(1)(a).

While it is undisputed that Rollins did not have a signed security agreement with Julien and did not have physical possession of the 68,640 uncertificated receipts, it is unclear whether "in the possession of the secured party," as contemplated by § 47–9–203(1)(a), encompasses possession by a bailee of the

---

**16.** The hypothetical chapter 7 analysis is performed even if the actual case was filed under chapter 11, as it was in the present case. *In re Tenna Corp.*, 801 F.2d 819, 821 (6th Cir.1986).

**17.** The rationale for this rule is that, " 'to the extent a secured creditor holding valuable collateral receives payment prior to bankruptcy, the amount of the secured claim is proportionately reduced.' " *Hale*, 15 B.R. at 567 (quoting *In re Hawkins Mfg., Inc.*, 11 B.R. 512, 513 (Bankr. D.Colo.1981)).

**18.** Collateral is "the property subject to a security interest." Tenn.Code Ann. § 47–9–105(1)(c).

**19.** There is no dispute that Tennessee law applies in the present case.

**20.** Article Nine of the Uniform Commercial Code, as codified at § 47–9–101 *et seq.* of the Tennessee Code Annotated, applies "to any transaction . . . which is intended to create a security interest in . . . documents." *Id.* § 47–9–102(1)(a). Under the code, warehouse receipts are "documents." *Id.* §§ 47–1–201(15), 47–9–105(f).

secured party.[21] The problem is twofold: first, "possession" is not defined in the code [22]; and, second, no court has directly addressed the issue of whether attachment can be accomplished through possession of the collateral by a bailee of the secured party. Accordingly, the Court must examine the purposes and policies of the attachment requirement in order to determine whether "in the possession of the secured party" includes possession by a bailee of the secured party.[23]

Attachment has two consequences: "First, the security agreement is enforceable against the debtor ..., [and, s]econd, the security interest becomes 'enforceable against ... third parties.'" White & Summers, *supra* note 2, at § 23–1 (quoting § 9–203(1) of the Uniform Commercial Code). While the secured party is not completely protected against third parties until it takes the additional step of perfecting its security interest, Tenn.Code Ann. §§ 47–9–301, 302, a security interest is enforceable by the secured party against the debtor once the requirements of § 47–9–203(1) have been met. Although attachment can be accomplished by possession, "[a] secured party's mere possession of collateral is not sufficient to establish a security interest." *Grossmann v. Saunders*, 237 Va. 113, 376 S.E.2d 66, 71 (1989). Rather, the possession must be "pursuant to agreement," Tenn.Code Ann. § 47–9–203(1)(a), which is defined as "the bargain of the parties in fact as found in their language or by implication from other circumstances," *id.* § 47–1–201(3). Thus, "evidence of agreement must establish that the secured party possesses the collateral for the purpose of securing the debtor's obligation." *Grossman*, 376 S.E.2d at 71. Accordingly, the attachment requirement serves to establish and define the agreement between the par-

ties—i.e., whether there is an agreement at all and what its terms are.

This interpretation is supported by the Official Comments to the Uniform Commercial Code.[24] Official Comment Three to § 47–9–203 provides that:

> One purpose of the formal requisite stated in subsection (1)(a) is evidentiary. The requirement of written record minimizes the possibility of a future dispute as to the terms of a security agreement and as to what property stands as collateral for the obligation secured. Where the collateral is in the possession of the secured party, the evidentiary need for a written record is much less than where the collateral is in the debtor's possession.

"'The second purpose of the signed-writing requirement is to serve as a Statute of Frauds, preventing the enforcement of claims based on wholly oral representations.'" *In re Modafferi*, 45 B.R. 370, 372 (S.D.N.Y.1985) (quoting *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1st Cir.1973)); Tenn.Code Ann. § 47–9–203, cmt. 5. Thus, the Court must examine whether L & S's possession of the 68,640 uncertificated receipts satisfied the evidentiary purposes of § 47–9–203(1).

Because there would have been no objective evidence of a security agreement between Julien and Rollins apart from Rollins's wholly oral representations, L & S's possession of the 68,640 uncertificated receipts, standing alone, would have been insufficient to meet the evidentiary purposes of § 47–9–203(1). Here, however, L & S did more than merely possess the uncertificated receipts— L & S issued two farmer's trust receipts to Rollins representing 68,640 uncertificated re-

---

21. Because a security interest perfected by possession "continues only so long as possession is retained," Tenn.Code Ann. § 47–9–305, it cannot be argued that Rollins had a perfected security interest in the certificated receipts.

22. White and Summers note that the drafters of the Uniform Commercial Code "wisely declined the futile task of defining possession ·in the Code." White & Summers, *supra* note 2, at § 23–10.

23. It is undisputed that L & S was not Rollins's agent.

24. Section 47–1–102(1) provides that "[i]n any dispute as to the proper construction of one or more sections of [the Uniform Commercial Code, the comments] ... shall constitute evidence of · the purposes and policies underlying such sections."

ceipts [25] and subsequently "blocked" a sufficient number of receipts in order to cover the uncertificated receipts represented by the farmer's trust receipts. Thus, Rollins is not seeking to enforce its claim based on wholly oral representations concerning its agreement with Julien. It is clear, given the policies of § 47–9–203(1), that such an effort would fail. In the present case, however, because of the combination of Julien's lack of possession of the collateral, the farmer's trust receipts, and L & S's collateral reports, which indicated that receipts were blocked for Rollins, there is objective evidence of an agreement between Rollins and Julien. Specifically, the farmer's trust receipts demonstrated that L & S held 68,640 uncertificated receipts "in trust" for Rollins. Because of this evidence, the possibility of a future dispute as to the terms of the agreement and the property that stood as collateral for the obligation secured was minimized. Thus, the evidentiary purposes of § 47–9–203(1)(a) were satisfied. Therefore, where there is objective evidence of an agreement between the parties, "possession of the secured party" encompasses possession of the collateral by a bailee of the secured party. Accordingly, because the evidentiary purposes of § 47–9–203(1)(a) were satisfied by L & S's possession of the uncertificated receipts, Rollins's security interest in the 68,640 uncertificated receipts attached pursuant to § 47–9–203(1).

Another consideration is § 47–1–102, which provides that the chapters of the Uniform Commercial Code "shall be liberally construed and applied to promote its underlying purposes and policies." Those purposes and policies are "to simplify, clarify and modernize the law governing commercial transactions [and] to permit the continued expansion of commercial practices through custom, usage and agreement of the parties."

Tenn.Code Ann. § 47–1–102(2)(a)–(b). As the bankruptcy court noted, oral agreements between cotton merchants—a group to which Rollins and Julien belong—are common in the industry. Here, Rollins and Julien, who had an ongoing business relationship with one another, reached a creative and mutually beneficial agreement that allowed Julien to avoid the overage penalties that were accruing on its cotton and allowed Rollins to maintain its security interest. Thus, the Court's interpretation of "possession" in this case is not only consistent with the purposes and policies behind the attachment requirement, but it is also consistent with the Code's purposes and policies of allowing the development of commercial practices between cotton merchants.

■ Accordingly, attachment, at least under circumstances where there is objective evidence of an agreement between the parties apart from wholly oral representations, can be accomplished through possession of the collateral by a bailee of the secured party.[26] Any other interpretation, given the facts of this case, would be to exalt form over substance—a result that cannot be countenanced considering the purposes and policies of § 47–9–203(1), in particular, and the Uniform Commercial Code, in general.

■ Because attachment can be accomplished through possession of the collateral by a bailee of the secured party, at least under certain circumstances, it must be determined whether L & S acted as a bailee for Rollins. The bankruptcy court concluded that, by issuing the two farmer's trust receipts and agreeing to "block" the 68,640 uncertificated receipts for Rollins, L & S acted as a bailee for Rollins. As explained below, L & S acted as a bailee for Rollins.

---

**25.** Although the two farmer's trust receipts recite that Rollins delivered the certificated warehouse receipts to L & S, Rollins, in fact, delivered the certificated receipts directly to Julien. Contrary to the argument of the trustee and Bankers Trust, however, this defect is not fatal. As White and Summers explain, the purpose of a written agreement is to allow a court to determine, using objective evidence, whether "the parties may have intended to create or provide for a security interest." White & Summers, *supra* note 2, at § 23–3. The writing must be sufficient to indi-

cate that the parties *may* have intended to create or provide for a security interest. *Id.* (emphasis added). Although, the farmer's trust receipts may not have been sufficient to constitute a written agreement under § 47–9–203(1), they were sufficient to indicate that the parties may have entered into an agreement, even though the recitals were incorrect to some extent.

**26.** This is the extent of the Court's holding.

"A bailment is a delivery of personalty for a particular purpose or on mere deposit, on a contract express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it or otherwise dealt with according to his direction or kept until he reclaims it." *Merritt v. Nationwide Warehouse Co.,* 605 S.W.2d 250, 252 (Tenn.Ct.App.1980). "Actual or constructive delivery of the property to the bailee is required for a bailment ..., that is, the property must be taken into the bailee's possession." *Id.* at 253. "A bailment is ordinarily created by delivery and acceptance and consent or agreement of the parties, but it may also result from actions and conduct of people concerning the goods in question." *Id.*

In the present case, Rollins did not deliver the certificated receipts to L & S. Rather, the certificated receipts went directly to Julien. L & S's records, however, reflected that L & S had received the certificated receipts from Rollins and that the documents were "in transit," which indicated that, although the L & S no longer had physical possession of the documents, L & S retained control over the documents pursuant to the sub-custodial agreement. Thus, L & S had de facto control over the certificated receipts given the prior course of dealing between L & S and Julien with respect to Julien's withdrawal of documents from the collateral pool. Thus, because L & S had de facto control over the certificated receipts in Julien's possession, the certificated receipts were constructively delivered to L & S by Rollins. *See id.* In addition, L & S was aware that the certificated receipts were going directly to Julien, yet it nonetheless issued the farmer's trust receipts to Rollins. Moreover, L & S acknowledged its role as a bailee for Rollins by issuing the two farmer's trust receipts and by subsequently blocking 68,640 receipts from the collateral pool on account of the farmer's trust receipts. Thus,

because Rollins constructively delivered the certificated receipts to L & S in exchange for the uncertificated receipts and L & S acknowledged its role as a bailee for Rollins, L & S acted as a bailee for Rollins. *See id.*

The final issue is whether Rollins perfected its security interest in the 68,640 uncertificated receipts. As discussed previously, once a security interest has attached, the secured party must perfect its security interest in order to protect that interest against third parties. Perfection is what protects the secured party's interest against other creditors of the debtor, including the trustee in bankruptcy.[27] Although perfection is usually accomplished through the filing of a financing statement by the secured party, *see* Tenn.Code Ann. § 47–9–302(1), perfection may be accomplished by possession in certain circumstances, *id.* § 47–9–302(1)(a). Under § 47–9–305, "[a] security interest in ... negotiable documents ... may be perfected by the secured party's taking possession of the collateral."

"The underlying policy behind perfection by possession is that possession ... by a third party coupled with the owner's lack of possession alerts prospective creditors that the ownership rights may be restricted or encumbered." *In re Raiton,* 139 B.R. 931, 937 (9th Cir. BAP 1992) (citing *In re Copeland,* 531 F.2d 1195, 1204 (3d Cir.1976)); *accord Tri–State Envelope of Md., Inc. v. Americans With Hart, Inc.,* 688 F.Supp. 769, 771 (D.D.C.1988) (explaining that "the primary purpose behind requiring creditors to take possession of certain collateral is to advise third parties that the debtor does not have unfettered use of, or control over, the collateral").[28] The rationale for allowing perfection by possession is that, because society "expect[s] owners to have possession or control of their assets," possession by a party who does not own the assets is a good indication of a security agreement. White & Sum-

---

27. Under 11 U.S.C. § 544(a)(1), the trustee in bankruptcy has the rights, pursuant to state law, of a hypothetical creditor with a lien on the property of the debtor. Thus, the bankruptcy trustee prevails over any unperfected security interests. *See* Tenn.Code Ann. § 47–9–301(1)(b).

28. Similarly, " '[t]he function of a financing statement is to put third parties on notice that the secured party who has filed it may have a perfected security interest in the collateral described.' " *Modafferi,* 45 B.R. at 372 (quoting *In re Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir.1972)).

mers, *supra* note 2, at § 23–10. Because the uncertificated receipts are negotiable documents, a security interest therein may be perfected by the secured party's taking of possession.

■ Here, however, the uncertificated receipts were in the possession of a bailee, L & S. When the collateral is held by a bailee, "the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest." Tenn.Code Ann. § 47–9–305. Under § 47–1–201(25), "[a] person has 'notice' of a fact when: (a) he has actual knowledge of it; [or] (b) he has received a notice or notification of it." While "it is clear that possession by the debtor or an individual closely associated with the debtor is not sufficient to alert prospective creditors of the possibility that the debtor's property is encumbered ... [i]t does not follow ... that possession of the collateral must be by an individual under the sole dominion and control of the secured party." *Copeland,* 531 F.2d at 1204; Tenn. Code Ann. § 47–9–305, cmt. 2. Instead, the notice function underlying the "bailee with notice" provision of § 9–305 is satisfied when there is "possession by a third party bailee, who is not controlled by the debtor, which adequately informs potential lenders of the possible existence of a perfected security interest." *Copeland,* 531 F.2d at 1204.[29] Thus, because the 68,640 uncertificated receipts were in L & S's possession, the Court must determine whether L & S had notice of Rollins's security interest in the receipts and whether L & S's possession adequately informed potential lenders of the existence of a possible security interest in the uncertificated receipts.

In the present case, L & S's knowledge of Rollins's security interest in the 68,640 uncertificated receipts was evidenced by the issuance of the farmer's trust receipts to Rollins and the blocking a sufficient amount of receipts on account of the farmer's trust receipts. In addition, by maintaining collateral reports which reflected that 68,640 uncertificated receipts were deducted from the collateral pool on account of the farmer's trust receipts issued to Rollins, L & S's

possession would have adequately informed any potential lender that at least 68,640 uncertificated receipts were subject to a possible security interest in favor of another party. Thus, because L & S had knowledge of Rollins's security interest and because potential lenders would have been adequately informed of the possible existence of a security interest, L & S's possession of the uncertificated receipts satisfied the "bailee with notice" provision of § 47–9–305. *See Copeland,* 531 F.2d at 1204. Accordingly, Rollins's security interest in the 68,640 uncertificated receipts was perfected under § 47–9–305.

### CONCLUSION

Because Rollins held a perfected security interest in the 68,640 uncertificated receipts at the time of the two transfers from Julien, the trustee cannot establish § 547(b)(5), and, therefore, the transfers from Julien to Rollins are not avoidable under § 547(b). Accordingly, the decision of the bankruptcy court is affirmed.

IT IS SO ORDERED.

---

**29.** The bankruptcy court found that L & S was

not controlled by Julien.